**Jennifer HARVEY, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (MONONGAHELA VALLEY HOSPITAL), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 12, 2009.

Decided Oct. 21, 2009.

Reargument Denied Dec. 17, 2009.

Gary D. Monaghan, Uniontown, for petitioner.

James D. Strader, Pittsburgh, for respondent.

Before: McGINLEY, Judge COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

Opinion BY Judge COHN JUBELIRER.[1]

Jennifer Harvey (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board), which affirmed the Workers' Compensation Judge's (WCJ) decision granting the modification petitions of Monongahela Valley Hospital (Employer). Before this Court, Claimant contends that the Board erred when it: (1) concluded that Employer was neither required to refer nor offer Claimant a nursing position that was actually open and available because Claimant no longer held an active registered nurse's license, and failed to reverse the WCJ's finding that the hypothetical nursing positions presented by Employer were vocationally available; and (2) failed to address Claimant's argument that Employer did not follow the requirements of the Workers' Compensation Act[2] (Act) in terms of the Impairment Rating Evaluation (IRE).

Claimant worked as a registered nurse for Employer and sustained work-related injuries when she was involved in a motor vehicle accident while leaving Employer's parking lot on July 4, 2001. As she left the parking lot, Claimant failed to make a left-hand turn to exit through the parking lot gate, drove over a four-inch curb, went over an embankment, and came to a stop in a wooded area. Claimant fractured her neck and underwent a spinal fusion of her cervical and thoracic vertebrae. While investigating Claimant's accident, the local police found two empty morphine vials in Claimant's vehicle, and Employer initiated an investigation into Claimant's handling of narcotic medications. *Monongahela Valley Hospital v. Workers' Compensation Appeal Board (Harvey)*, No. 1337 C.D. 2004, slip op. at 10–11 (Pa.Cmwlth. April 4, 2005). Employer notified Claimant of its investigation on July 12, 2001. *Id.* As a result of its investigation, Employer concluded that Claimant had, on four occasions in a ten-month period, violated Employer's narcotic medication policy by checking out narcotics, but not indicating in patient records that the narcotics had been administered. Employer discharged Claimant on July 16, 2001, based on her violation of Employer's narcotic medication policy. *Id.*

On December 30, 2002, the WCJ granted Claimant's claim petition and determined that her injuries were caused in significant part by the condition of the premises, specifically, the lack of a barrier around the parking lot. The WCJ also determined that Claimant was discharged from employment by Employer for reasons unrelated to her work injury. The Board affirmed the WCJ's decision and specifically determined that Claimant was

---

1. The majority opinion was reassigned to the authoring judge on September 9, 2009.

2. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2708.

properly discharged due to irregularities associated with her administration of narcotics.

Employer petitioned this Court for review of the Board's order and argued that there was no substantial evidence to support the WCJ's finding that the physical condition of Employer's parking lot caused Claimant to drive over the embankment. *Monongahela Valley Hospital.* Claimant cross-petitioned and argued that her discharge was pretextual and designed to relieve Employer from having to provide disability benefits. This Court affirmed the Board's order. This Court determined that the WCJ, who is the ultimate fact finder, credited Employer's witnesses over Claimant that her discharge was for reasons unrelated to her work injury.

On October 6, 2006, Employer filed a modification petition (First Modification Petition) in which it sought to modify benefits on the basis that "[w]ork would be available with Monongahela Valley Hospital within the limitations set by Dr. Bookwalter had the employee not been terminated from employment for conduct not related to the work injury." (First Modification Petition at 1, October 6, 2006.) On July 31, 2007, Employer petitioned to modify benefits (Second Modification Petition) on the basis that "[Claimant]'s benefit status is to be changed from total to partial based on an Impairment Rating Evaluation of Dr. Jon Tucker of 25%." (Second Modification Petition at 1, July 31, 2007.) The WCJ consolidated the First Modification Petition and Second Modification Petition (together, Modification Petitions) and held a hearing, at which Employer and Claimant presented evidence.

David E. Clark (Clark), Employer's vice president for human resources, testified that three jobs were available for a registered nurse: (1) a cardiac monitoring nurse, who would sit and monitor cardiac monitors in the progressive care unit; (2) a case manager utilization review nurse, who would review patient charts while the patient was in the hospital; and (3) a utilization review nurse, who would review the chart after discharge and assist the coders in applying the proper codes to be sent to insurance companies and Medicare for payment. (WCJ Hr'g Tr. at 10–11, November 29, 2006.) These jobs were within Claimant's restrictions; however, Clark testified that Employer would not offer Claimant these positions because "she does not hold a current license as a registered nurse which would be required for each one of these positions." (WCJ Hr'g Tr. at 11.) On cross-examination, Clark added the position of assessment nurse as a possible position within Claimant's medical restrictions. (WCJ Hr'g Tr. at 12.) Clark admitted that he had not provided these job descriptions to Claimant or to any physicians. (WCJ Hr'g Tr. at 13.) Further, these positions were not available to Claimant because of her "termination and because of her license status." (WCJ Hr'g Tr. at 14.)

Employer also presented the deposition testimony of John William Bookwalter, M.D. (Dr. Bookwalter), a board-certified neurosurgeon. For purposes of this litigation, Dr. Bookwalter examined Claimant on August 28, 2006, took a history, and reviewed medical records. Dr. Bookwalter opined:

> It was my impression that she had sustained a T3 compression fracture and had undergone several surgical procedures. At the time of that evaluation of August 28, 2006, the symptoms which she was experiencing in terms of her chronic cervical and thoracic pain were stable and were a consequence of that event. I felt that she was at maximum medical improvement, and it was my opinion that further therapeutic inter-

ventions were ... unlikely to substantially alter her physical capacities of her symptom complex.

(Bookwalter Dep. at 10.) Dr. Bookwalter released Claimant to part-time sedentary work of four hours per day, five days per week. Dr. Bookwalter limited Claimant to lifting ten pounds occasionally and believed Claimant could "sit, stand, and walk up to a total of two hours per day and drive up to a total of an hour." (Bookwalter Dep. at 10.) Dr. Bookwalter believed Claimant could perform the jobs Clark described. (Bookwalter Dep. at 11.)

Employer also offered the deposition testimony of Jon B. Tucker, M.D. (Dr. Tucker), a board-certified orthopedic surgeon, who conducted an IRE of Claimant on May 15, 2007. Dr. Tucker rated Claimant with a 12.5 percent whole person impairment attributable to a partially fused thoracic spine in a kyphotic [3] position and a 14 percent whole person impairment for the cervical spine. Dr. Tucker used the combined values table prepared by the American Medical Association to determine a whole person impairment of 25 percent. (Tucker Dep. at 9–10.)

Employer also introduced into evidence the State Board of Nursing Disciplinary Actions from April 2007, which stated:

[Claimant] ... had her license indefinitely suspended, based on findings she is unable to practice the profession with reasonable skill and safety to patients by reason of mental or physical illness or condition of physiological or psychological dependence upon alcohol, hallucinogenic or narcotic drugs or other drugs which tend to impair judgment or coordination, she possessed, used, acquired or distributed a controlled substance or caution legend drug for other than an acceptable medical purpose, she falsified or knowingly made incorrect entries into patient records, and is guilty of immoral or unprofessional conduct in the departure from or failure to conform to ethical and/or quality standards of the profession concerning medication administration and dispensing and record keeping.

(Pennsylvania Department of State, State Board of Nursing Disciplinary Actions at 3, April 2007.)

Claimant testified on her own behalf. Claimant testified that she could not return to her time-of-injury job as a registered nurse. (WCJ Hr'g Tr. at 17–18.)

Claimant also presented the deposition testimony of Lisa Weidner, M.D. (Dr. Weidner), Claimant's treating physician since July 2001, who is board-certified in anesthesiology, pain management, and acupuncture. Dr. Weidner explained that Claimant suffered a T2–T3 compression fracture in the automobile accident and underwent emergency surgery. She subsequently had a fusion of her cervical and thoracic spine. (Weidner Dep. at 8.) Dr. Weidner diagnosed Claimant with "postcervical thoracic laminectomy, pain syndrome with myofacial pain." (Weidner Dep. at 13.) Dr. Weidner testified within a reasonable degree of medical certainty that Claimant could not work as a registered floor nurse in a hospital setting. Dr. Weidner opined within a reasonable degree of medical certainty that it was reasonable that Claimant could perform the jobs mentioned by Clark on a part-time basis. (Weidner Dep. at 18–20.)

The WCJ granted both Modification Petitions and reduced Claimant to partial

---

**3.** Kyphotic is defined as "affected with or pertaining to kyphosis." *Dorland's Illustrated Medical Dictionary,* 951 (29th ed.2000). Kyphosis is defined as "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; hunchback." *Id.*

**1258**

disability benefits in the amount of $246.31 per week, commencing November 19, 2006, based on the First Modification Petition. With respect to the Second Modification Petition, due to the impairment rating, the WCJ deemed Claimant's benefits to be partial beginning August 19, 2007, independent of the First Modification Petition. The WCJ made the following relevant findings of fact:

13. As noted in my prior decision in this case, as well as the testimony of Mr. Clark, the claimant was terminated from her employment with Monongahela Valley Hospital as the result of nonwork injury related incidents. It is also noted that the claimant has had her registered nurse licensed [sic] suspended as a result of noninjury related incidents. Consequently, Monongahela Valley Hospital must be able to identify actual available positions for the claimant, that is positions within the claimant's restrictions, however, Monongahela Valley Hospital is not required to offer those positions to the claimant since the claimant was terminated from employment and since her licensed [sic] has been suspended as the result of nonwork related problems. I do find as a fact that the three part time jobs identified by Mr. Clark would be available to the claimant for the purposes of modifying claimant's workers' compensation benefit, if it is found as a fact that claimant can physically perform those jobs. Additionally, I find those jobs to have become vocationally available for the purposes of the Act on November 19, 2006, the date that Mr. Clark testified as to the particular duties of each of those positions. These positions would pay an average weekly wage of $502.80 based upon 20 hours of employment a week (five days a week, four hours a day) at a rate of $25.14 per hour.

14. I have carefully considered all of the evidence of record, both medical and lay, and find as a fact that as of November 19, 2006, the claimant was physically capable of performing each of the three part-time jobs. In making this finding of fact, I rely on the competent, credible and substantial medical opinion rendered in this matter by Dr. Bookwalter. Dr. Bookwalter, who is a Board certified neurosurgeon, saw the claimant on two occasions and following his April 28, 2006 evaluation, specifically found that the claimant was capable of performing each of those positions. I have carefully considered the opinion of Dr. Weidner and would note that Dr. Weidner had no objection to the claimant attempting that type of work and, in fact, found that type of part-time work to be "reasonable provided she is able to do as I mentioned, keep the neck within a neutral position, not lift greater than 10 pounds and to also have the ability to take time to do some stretching." Dr. Weidner did conceive that it was unknown how the claimant would be able to do that work but objectively, these positions would be reasonable for her to do on a part time basis. Certainly, there is nothing in the job descriptions given by Mr. Clark that would lead to a finding that the claimant could not keep her head in a neutral position in these jobs or could do stretching as required. Consequently, based upon the testimony of Dr. Bookwalter as corroborated by the testimony of Dr. Weidner, I find as a fact that the claimant could perform this type of work.

15. I have carefully considered all of the evidence of record, both medical [and] lay, and find as a fact that as of August 19, 2007, via the impairment rating performed by Dr. Tucker on May 15, 2007, the claimant had a 25% AMA guideline impairment causing her bene-

fits to be considered partial in nature, independent of the Findings of Fact 13 and 14 above which found claimant's workers' compensation benefits to become partial in nature as of November 19, 2006 based upon the claimant's earning power as of November 19, 2006. Dr. Tucker's opinion concerning the 25% impairment is uncontradicted in the record and is based upon Dr. Tucker's assessment of May 15, 2007. Dr. Tucker is certified by the Bureau of Workers' Compensation to perform impairment ratings and has credibly set forth in his deposition the manner that he conducted the impairment rating which is in accord with the Act. The August 19, 2007 date is the effective date for this particular section of the Act which would be 60 days from the issuing of the impairment rating determination face sheet which occurred on June 19, 2007 . . . . (Citation omitted).

(WCJ Decision, Findings of Fact (FOF) ¶¶ 13–15, April 15, 2008.)

Claimant appealed to the Board, which affirmed. As to the First Modification Petition, the Board held that the WCJ did not err in determining that Employer was not required to actually offer the modified jobs to Claimant because she was no longer licensed to perform them. The Board stated that "[Employer] should not be required to do a vain act, just to satisfy a desire for consistency under the law." (Board Op. at 5.) As to the Second Modification Petition, Claimant argued in her brief to the Board that the WCJ erred in modifying benefits because it was based on IRE results from an August 19, 2007 evaluation which was more than sixty days following Claimant's receipt of two years

(104 weeks) of disability benefits. However, the Board did not address this argument because "this issue was not raised by Claimant." (Board Op. at 1 n. 1.) Claimant now petitions this Court for review.

Before this Court, Claimant raises two issues. First, she contends that the Board erred when it affirmed the WCJ's decision as to the First Modification Petition. Specifically, Claimant contends that the WCJ erred by concluding that Employer was neither required to refer, nor offer, Claimant a position that was actually open and available because Claimant no longer held an active registered nurse's license, and finding that the hypothetical positions presented by Employer were vocationally available to Claimant. Second, Claimant argues that the Board erred in failing to address her argument as to the Second Modification Petition. Specifically, Claimant contends that Employer failed to follow the requirements of the Act in terms of the IRE.[4] We will address each of these arguments in turn.

First, Claimant contends that the Board erred as a matter of law when it concluded that Employer was not required to offer Claimant a position that was actually open and available. We disagree.

In *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 516 Pa. 240, 532 A.2d 374 (1987), our Pennsylvania Supreme Court adopted the following requirements which an employer must meet to satisfy its burden to modify compensation payments:

1. The employer who seeks to modify a claimant's benefits on the basis that he has recovered some or all of his ability must first produce medical evidence of a change in condition.

---

4. This Court's review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, or whether constitutional rights were violated. *Vinglinsky v. Workmen's Compensation Appeal Board (Penn Installation)*, 139 Pa.Cmwlth.15, 589 A.2d 291, 293 (1991).

2. The employer must then produce evidence of a referral or referrals to a then open job (or jobs), which fits the occupational category which the claimant has been given medical clearance, e.g., light work, sedentary work, etc.

3. The claimant must then demonstrate that he has in good faith followed through on the job referral(s).

4. If the referral fails to result in a job then the claimant's benefits should continue.

*Kachinski*, 516 Pa. at 252, 532 A.2d at 380.

Claimant argues that, under *Kachinski*, Employer was required to show that it had referred to Claimant a then open job or jobs; however, Employer failed to do so because Employer admitted that none of the identified modified positions ostensibly within Claimant's medical restrictions were actually referred to Claimant.[5] The WCJ excused Employer from this requirement because Claimant "was terminated from employment and since her licensed [sic] has been suspended as the result of non-work related problems." (FOF ¶ 13.) Claimant relies on this Court's decision in *Brandywine Mazda Suzuki v. Workers' Compensation Appeal Board (Asman)*, 872 A.2d 253 (Pa.Cmwlth.2005), and contends that because Claimant was terminated after her date of injury for conduct that occurred *prior* to her work injury, Claimant's pre-injury conduct is irrelevant and should not have been considered by the WCJ.

■ Where an employer waits until after a work injury to terminate an employee for misconduct that the employer was aware of prior to the work injury, the employer is not excused from showing job availability before benefits can be modified. *Brandywine*, 872 A.2d at 257. In *Brandywine*, the claimant, who suffered a work-related injury on July 13, 2001, was terminated on July 24, 2001 for inadequacies in his job performance that had occurred and which employer was aware of prior to his injury. The WCJ suspended the claimant's benefits without requiring the employer to show job availability because the WCJ determined that any loss of earnings after November 19, 2001, the time in which he could return to work without restrictions, was not due to the work injury. The Board reversed the WCJ's decision and held that, because the claimant's substandard job performance occurred prior to his work injury, the claimant's loss of earnings resulted from disability due to the work injury, and benefits could not be suspended absent proof of available work. This Court affirmed.

In *Reyes v. Workers' Compensation Appeal Board (AMTEC)*, 967 A.2d 1071 (Pa. Cmwlth.2009), the employer immediately terminated the employee/claimant for pre-accident misconduct once the employer learned of the misconduct. *Id.* at 1078. This Court denied the claimant's claim petition because the claimant's wage loss was unrelated to his work injury and disagreed with the claimant's argument "that because his misconduct preceded the work

---

5. Under Section 306(b)(2) of the Act, 77 P.S. § 512(2), an employer who seeks to modify a claimant's total disability to partial may do so by establishing the claimant's earning power. "Earning power" is determined by the work a claimant is capable of performing based upon expert opinion evidence. 77 P.S. § 512(2). The employer must establish that the claimant is able to perform his previous work or can engage in any other gainful employment in the usual employment area where the claimant lives. 77 P.S. § 512(2). Alternatively, an employer may modify benefits by showing job availability under *Kachinski*. *Diehl v. Workers' Compensation Appeal Board (IA Construction)*, 972 A.2d 100, 103 (Pa.Cmwlth.2009). Here, Employer proceeded under *Kachinski*.

injury, [the e]mployer was required to show the availability of light-duty work" pursuant to *Brandywine.* *Id.* at 1076. This Court stated:

> The fact that [the c]laimant's misconduct occurred one day before he was injured is irrelevant because [the e]mployer only learned of the misconduct after [the c]laimant was injured and acted immediately. *Because [the e]mployer fired [the c]laimant as soon as it learned of his misconduct, this case is not governed by Brandywine* .... In any case, [the c]laimant's *Brandywine* argument also fails because ... he never proved a disability, the threshold to a *Brandywine* inquiry.

*Id.* at 1078 (emphasis added).

The difference between the relevant facts in *Brandywine* and *Reyes* rests on the time frame of when the claimants' misconduct was discovered by their employers. In *Brandywine,* the employer was aware of the alleged misconduct before the injury took place. The employer had ample opportunity to discipline the claimant for that misconduct prior to the injury, but did not do so. In contrast, in *Reyes,* the employer became aware of the misconduct only after the injury at issue. Once the employer in *Reyes* became aware of the misconduct, it acted swiftly.

■ In this case, as in *Reyes,* Employer only learned of Claimant's misconduct after her work injury and acted swiftly and openly in addressing it. When Employer learned that the police officers, who were investigating the accident scene, discovered two empty narcotics containers in Claimant's vehicle, Employer immediately began its investigation into Claimant's record keeping of narcotics on July 7, 2001. Employer informed Claimant of its investigation on July 12, 2001, and terminated her employment on July 16, 2001. Thus, *Brandywine* is inapplicable, and the Board

did not err in considering Claimant's pre-injury misconduct in affirming the WCJ's grant of the First Modification Petition.

■ Moreover, we agree with the WCJ and the Board that, although Employer was required to identify actual available positions within Claimant's medical restrictions, Employer was not required to offer those available nursing positions to Claimant based on Claimant's termination for violating Employer's narcotic medication policy and her suspended nursing license. In *Edwards v. Workers' Compensation Appeal Board (Sear's Logistic Services),* 770 A.2d 805 (Pa.Cmwlth.2001), this Court held that because the claimant's loss of earnings was not caused by her work injury but, rather, caused by her termination for misconduct, the employer was not required to show availability of an alternative position for purposes of suspension of benefits. In that case, the claimant suffered a work injury on November 9, 1995, but continued working. On November 16, 1995, the employer took the claimant to the hospital for treatment. At the hospital, the claimant tested positive for illegal drug use, and the employer subsequently terminated the claimant on November 22, 1995 for violating the employer's drug policy. The claimant argued that he should continue to receive benefits and relied on this Court's decision in *United Parcel Service v. Workmen's Compensation Appeal Board (Portanova),* 140 Pa.Cmwlth. 626, 594 A.2d 829 (1991), which held "that where ... a claimant is discharged because of misconduct which occurred, not only prior to the injury, but also prior to the payment of benefits and the creation of a light-duty position, a claimant's loss of earnings shall be deemed to have resulted from a disability due to injury." *Id.* at 832. In such matters, "the employer [has] its usual burden to show the availability of work performable without a loss of earn-

ings." *Id.* This Court disagreed that the claimant should continue to receive benefits and affirmed the Board's denial of benefits. This Court reasoned in *Edwards* that:

> Where, as here, it is established that the claimant's loss of earnings is no longer the result of the work-related disability, the employer is not required to establish the availability of an alternative job within the claimant's medical restrictions. Moreover, the WCJ accepted the testimony of [the e]mployer's witness and found that a sedentary position within [the c]laimant's medical restrictions was available at the time of the termination of his employment.

*Edwards*, 770 A.2d at 808 (citations omitted). Thus, *Edwards* marked a shift from *Portanova:*

> It has previously been held [in *Portanova* ] that a claimant is entitled to disability benefits if she is discharged for misconduct that took place prior to the work-related injury as her loss of earnings shall be deemed to have resulted from the work injury.... In *Edwards* [ ], we rejected the holding of *Portanova* and clarified that the only relevant issue in deciding whether a claimant's benefits should be suspended is whether *the loss of earnings was no longer the result of the work injury.*

*Coyne v. Workers' Compensation Appeal Board (Villanova University)*, 942 A.2d 939, 946 (Pa.Cmwlth.2008) (citations omitted) (emphasis in original).

▪ Like *Edwards*, Claimant's loss of earnings is the direct result of her termination and subsequent loss of her nursing license for professional misconduct, and not the result of her work injury. As such, we cannot agree with Claimant that Employer was required to refer Claimant to one of the identified nursing positions with Employer. Such would be a futile act and would promote form over substance. Because these identified available positions would have been referred to Claimant had she not lost her job and nursing license for professional misconduct, Employer is not required to establish earning power outside of employment with Employer via expert opinion evidence under Section 306(b)(2) of the Act, 77 P.S. § 512(2).

▪ Claimant's next argues that the Board erred, with regard to the Second Modification Petition, by not addressing Employer's failure to follow the requirements of the Act with respect to the timing of IREs.[6] Specifically, Claimant argues

---

**6.** Section 306(a.2) of the Act, 77 P.S. § 511.2, provides the means by which an employer may obtain a modification of benefits based on an impairment rating evaluation. This section provides, in pertinent part:

> (1) When an employe has received total disability compensation pursuant to clause (a) for a period of one hundred four weeks, unless otherwise agreed to, the employe shall be required to submit to a medical examination which shall be requested by the insurer *within sixty days upon the expiration of the one hundred four weeks* to determine the degree of impairment due to the compensable injury, if any.

77 P.S. § 511.2(1) (emphasis added).

In order to modify a claimant's disability status, an employer must follow the guide-

lines of the Act and must prove that a claimant's impairment rating evaluation is less than fifty percent and that the claimant had reached maximum medical improvement at the time of the impairment rating evaluation. *Combine v. Workers' Compensation Appeal Board (National Fuel Gas Distribution Corporation)*, 954 A.2d 776, 781 n. 4 (Pa.Cmwlth. 2008), *appeal denied*, 600 Pa. 765, 967 A.2d 961 (2009). The modification based on an impairment rating evaluation does not change a claimant's rate of compensation by itself, but it limits a claimant's compensation to five hundred weeks. *Diehl*, 972 A.2d at 104–05. An employer must establish the claimant's earning power. *Id.*

that the WCJ erred when he granted the Second Modification Petition because the IRE took place more than sixty days following Claimant's receipt of two years of total disability benefits. The Board did not address this argument because Claimant failed to raise it before the WCJ, which Claimant concedes. Issues not raised before the WCJ are considered waived, and the Board correctly determined that it was precluded from reviewing the issue. *DeMarco v. Jones & Laughlin Steel Corporation,* 513 Pa. 526, 530–32, 522 A.2d 26, 28–29 (1987).[7]

Accordingly, this Court affirms the order of the Board.

## ORDER

NOW, October 21, 2009, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby affirmed.

## CONCURRING AND DISSENTING OPINION BY Judge McGINLEY.

I concur in part and dissent in part to the majority opinion. I concur with the affirmance of the Board's determination that Claimant waived any issue with respect to the modification of benefits pursuant to the Impairment Rating Evaluation. Claimant did not raise this issue before the WCJ.

I respectfully dissent to the majority's conclusion that Employer did not have to provide proof of available work in order to suspend benefits under *Kachinski*. I believe that *Brandywine* controls. As the majority states, this Court held in *Brandywine:*

[W]hen a claimant has proven a disabling work injury, *i.e.,* a loss of earning caused by a work injury, then pre-injury grounds for firing the claimant cannot act as a superseding cause of a claimant's loss of earnings and relieve employer of having to show job availability in order to obtain a suspension of benefits. In as much as Brandywine Mazda fired Asman for poor job performance which occurred prior to the injury, the Board properly concluded that benefits could not be suspended absent proof of available work.

*Brandywine,* 872 A.2d at 257.

That is precisely the situation here. Claimant established that she suffered a work-related injury. Employer fired Claimant for conduct which occurred prior to her injury. Consequently, Employer was required to establish proof of available work in order to suspend benefits under *Kachinski*.

The majority asserts that *Reyes* is closer factually to the present case than is *Brandywine*. The majority asserts that *Brandywine* is inapplicable because Employer only learned of Claimant's misconduct after her work injury and swiftly addressed it. When Employer learned that police officers had discovered two empty narcotics containers Employer promptly investigated Claimant's narcotics recordkeeping and fired her shortly thereafter.

While *Reyes* did involve a claimant whose employer did not learn of the misconduct until after the employee was injured, I believe that the majority relies too much on *Reyes*. Clearly, that portion of the opinion which addressed *Brandywine*

---

**7.** Assuming, arguendo, that Claimant preserved this issue, she would not prevail. In *Diehl,* this Court determined that if an employer requests an impairment rating evaluation after the expiration of the sixty-day window, the employer may not change a claimant's disability status unilaterally. *Id.* at 104–05. Rather, an employer must proceed before a WCJ and establish that a claimant's impairment is less than fifty percent. *Id.* at 105. Employer satisfied this burden.

was dicta. Before this Court, Robert Reyes (Reyes) contended that he was entitled to disability benefits from the date of injury until the employer's medical witness, Dr. Noble, examined him. Reyes contended that Dr. Noble opined that he was limited to light duty work after the accident. Reyes then asserted that because Reyes's misconduct preceded his work injury the employer was required to show the availability of light duty work. This employer failed to do. Our Court rejected Reyes's argument that he established disability through Dr. Noble's testimony. Because he never established disability the Court did not need to reach the *Brandywine* issue. This Court did say that the case was not governed by *Brandywine* because the employer fired Reyes as soon as it learned of his misconduct. While it does distinguish *Brandywine,* I believe it did so as dicta. The last paragraph of the analysis states, "In any case, Claimant's [Reyes] *Brandywine* argument also fails because, as explained above, he never proved a disability, the threshold to a *Brandywine* inquiry." *Reyes,* 967 A.2d at 1078.

I believe that *Brandywine* controls.